IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA L. INTESO, | ) | Case No. 1:16-cv-1893 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Rebecca L. Inteso seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because Inteso has not identified any error of law in the ALJ's handling of the case after remand or any lack of substantial evidence to support the ALJ's post-remand decision, I recommend that the final decision of the Commissioner be **AFFIRMED**.

## II.     Procedural History

In 2011, Inteso filed for DIB, alleging disability since April 1, 2008.  (Tr. 58, 137)  After the agency denied her application, Inteso attended a hearing before Administrative Law Judge Peter Beekman ("ALJ").  (Tr. 23-48)  The ALJ denied Inteso's claim on August 20, 2012, and after the Appeals Council declined review, it became the final decision of the Commissioner. (Tr. 1-6, 9-22)

Inteso then filed suit in this court (Case No. 1:14-cv-00903).  On October 10, 2014, Magistrate Judge Kathleen B. Burke reversed and remanded the matter for further proceedings consistent with the parties' joint stipulation, which provided:

> Upon remand, the agency will afford Plaintiff the opportunity for a new hearing before an ALJ, where Plaintiff may testify and present additional arguments and evidence. The ALJ will further evaluate the claimant's residual functional capacity (RFC) based on the evidence of record, including evidence from 2008 through the date of the ALJ 's decision. The ALJ will further evaluate the opinion of the treating cardiologist, Dr. Grinblatt. The ALJ will, if necessary, obtain supplemental evidence from a vocational expert to clarify the claimant's past relevant work. The ALJ will also consider whether the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles (DOT), pursuant to Social Security Ruling (SSR) 00-4p. The ALJ will proceed through the sequential evaluation process as needed to reach a de novo decision.

(Tr. 878-79)

After this court's remand, Administrative Appeals Judge Kenneth Matheny issued an order vacating the final decision of the prior decision and remanding the matter to the ALJ for resolution of the following issues:

- The decision did not adequately evaluate the opinion of treating cardiologist, Michael S. Grinblatt, M.D.  On September 28, 2011, Dr. Grinblatt completed a cardiac residual functional capacity (RFC) questionnaire (Ex. 16F).  Dr. Grinblatt indicated that the claimant can stand and/or walk less than 2 hours and sit about 2 hours total in an 8 hour workday; will need unscheduled breaks every 1to 2 hours for 15to 20 minutes; will need to elevate legs 12 inches with prolonged sitting; can lift 10 lbs. occasionally and less than 10 lbs. frequently; should avoid concentrated exposure to noise, moderate exposure to wetness and humidity, and all exposure to extreme cold, heat, fumes, odors, dusts, gases,

poor ventilation, and hazards, and will likely be absent from work as a result of impairments or treatment about three times a month (Ex. 16F/4 -5). This opinion was rejected because the evidence did not support Dr. Grinblatt's conclusions (Administrative Law Judge Hearing Decision, August 20, 2012, pg. 5 of 6). The decision specified that Dr. Grinblatt reported the claimant's status as "much improved," that the claimant's gait was normal, and that the claimant engaged in daily activities of laundry, shopping, and caring for her mother (Id.). With respect to Dr. Grinblatt's comments, the claimant was reported to be much improved in August 2011, three months post cardiac revascularization (Ex. 14F/6). However, the claimant alleges onset of disability since April 2008. Moreover, Dr. Grinblatt has treated the claimant since the alleged onset date and the opinion itself considered the period from April 1, 2008 through the present (Ex. l6F/3). One month earlier, Dr. Grinblatt reported the claimant having lots of chest discomfort with tenderness over sternum and bilateral axilla (Ex.14F/9). While the claimant may have been improved in August 201 l, this rationale does not address the validity of Dr. Grinblatt's opinion during the initial three years of the alleged period of disability. In addition, the decision did not specify whether the claimant demonstrated normal gait or engaged in the daily activities on a sustained basis or explain how the ability to perform these functions contradicted Dr. Grinblatt's opinion that the claimant would have difficulty engaging in work activity on a regular and continuing basis.

- The decision limited discussion of the cardiac impairment to noting stent placements in 2005, cardiac revascularization in May 2011, and the report by treating cardiologist in August 2011 that the claimant's cardiac status is "much improved" and that LVEF was up to 45% (Administrative Law Judge Hearing Decision, August 20, 2012, pg. 5 of 6 citing Ex. IF, 2F, 9F, 12F, 14F). However, the period at issue is April I, 2008, the alleged onset date, through March 31, 2012, the date last insured. The decision focuses almost exclusively on medical records relating to treatments received in May 2011 and August 2011 (Administrative Law Judge Hearing Decision, August 20, 2012, pg. 5 of 6). The record contains multiple hospital and treatment records relating to the period from before and after those few months in 2011which document uncontrolled diabetes, chest pain, and difficulty affording treatment (Ex. 3F; 4F; 5F; 6F; 8F; 9F; l0F; 1lF; 12F; 21F; 27F; 29F; 30F). However, this evidence was not addressed in the decision.

- Based on the testimony of the vocational expert (VE), the claimant was found to be capable of her past relevant work as a quality control circuit board worker/touch up screener printed circuit board assembly, Dictionary of Occupational Title (DOT) #726.684-010 (Administrative Law Judge Hearing Decision, August 20, 2012, pg. 5 of 6; Transcript of Oral Hearing, pgs. l9-20, 23). The VE and the decision noted this occupation is sedentary and unskilled per the DOT. However, the occupation listed under that DOT # is "capacitor pack press operator." Moreover, this occupation is described as medium in the DOT.

(Tr. 873-74) The Appeals Council then instructed the ALJ as follows:

- Give further consideration to the treating and nontreating source opinions, including but not limited to the opinion of Dr. Grinblatt, pursuant to the provisions of 20 CFR 404.1527

and Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments through the date last insured (20 CFR 404.1512). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.

- As appropriate, give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Rulings 8 16 and 96-8p).

- As appropriate, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-12, 83-14, 85-15, and 96-9p). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on the vocational expert evidence the Administrative Law Judge will identity and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Tr. 874-75)

Inteso, a vocational expert, and a medical expert all testified at a remand hearing on February 1, 2016. (Tr. 1530-90) Before that hearing, Inteso filed a claim for SSI that was escalated to the hearing level and considered along with her remanded application for DIB. (Tr. 853) On June 24, 2016, the ALJ again denied Inteso's claim for benefits. (Tr. 850-70) Inteso bypassed the Appeals Council and filed the instant matter with this court on July 27, 2016.[1] ECF Doc. No. 1.

---

[1] In accordance with 20 CFR §§ 404.983 & 404.984, "when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand …unless the Appeals Council assumes jurisdiction of the case." In this case, the Appeals Council instructed the ALJ to offer Inteso "the opportunity for a hearing and take further action to complete the administrative record and issue a new decision." (Tr. 875) Thus, the Appeals Council did not assume jurisdiction and Inteso did not have to return to the Appeals Council before filing with the district court. Furthermore, *Drummond* (mandating that an ALJ must adopt a prior assessment of

4

### III.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at

---

a claimant's RFC absent new or changed circumstances) does not apply when the prior decision was vacated.  *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir.1997); *See Wireman v. Comm'r of Soc. Sec.*, 60 Fed.Appx. 570, 570 (6th Cir.2003) (holding that Drummond applies to final decisions and holding that "[t]he only final decision in this case is the ... decision which is now before this Court. All other decisions relevant to [plaintiff's claim] never became final as they were vacated pursuant to remand[ ] for further proceedings."); See also HALLEX I-2-8-18, Administrative Law Judge Decision When Case Remanded by Court ["If the Appeals Council (AC) remands a case to the hearing level after a court remand, it generally vacates the entire administrative law judge (ALJ) decision, and the ALJ must consider all pertinent issues de novo.]

[2] "[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV.    The ALJ's Decision

The ALJ made the following findings in his June 24, 2016, decision:

1. Inteso last met the insured status requirements of the Social Security Act on December 31, 2017. (Tr. 856)

2. Inteso did not engage in substantial gainful activity since April 1, 2008, the alleged onset date. (Tr. 856)

3. Inteso had the following severe impairments: ischemic heart disease status post stents, obesity, diabetes mellitus, and anxiety disorder. (Tr. 856)

4. Inteso did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 857)

5. Inteso had the residual functional capacity ("RFC") to perform light work except she could lift/carry 20 pounds occasionally and 20 pounds frequently; stand/walk six out of eight and sit six out of eight; push/pull and frequently foot pedal; can occasionally use a ramp or stairs but never a ladder, rope or scaffold; can constantly balance, occasionally stoop, kneel, crouch and crawl; reaching, handling, fingering and feeling are all constant; visual capabilities and

6

communication skills are constant; she should avoid dangerous machinery and unprotected heights; she should do low stress work and by that I mean no high production quotas, no piece rate work, no work involving arbitration, negotiation, confrontation, or supervision.  (Tr. 858)

6.  Inteso was capable of performing past relevant work as a touch up screener. This work did not require the performance of work-related activities precluded by her RFC.  (Tr. 861)

Based on these findings, the ALJ determined that Inteso had not been under a disability from April 1, 2008, through the date of the decision.  (Tr. 862).

## V.  Relevant Evidence

### A.  Treatment Records[3]

Inteso has a long history of treatment for coronary artery disease by Michael S. Grinblatt, M.D., at the Cardiovascular Consultants of Cleveland.  (Tr. 734)  In 2005, Inteso underwent cardiac catheterization and stent placement by Dr. Grinblatt.  (Tr. 210)  On April 18, 2008, Inteso reported increased personal stress due to a family illness and the expiration of her health insurance.  (Tr. 375)  Dr. Faiman noted that her legs were swollen but had improved.  (Id.)  On April 25, 2008, Inteso sought treatment from the Cleveland Clinic Family practice complaining of chest heaviness and not feeling well.  (Tr. 723, 859)

Inteso was seen in the emergency room on May 7, 2008, with chest tightness and shortness of breath. (Tr. 387)  She felt much better after taking Ativan and the impression was dyspnea and hyperventilation.  (Tr. 388)  In June 2008, Inteso reported chest heaviness and that she did not feel well.  (Tr. 723)  In November 2008, she reported chest pounding.  (Tr. 722)

In April 2009, Inteso reported to Dr. Faiman that she had discontinued her medication and had not come for several months due to lack of health insurance.  (Tr. 379)  She had not been

---

[3] The arguments before the court primarily involves the time period from 2008 through 2012. Accordingly, the undersigned will primarily summarize treatment notes from this period.

exercising, following a specific diet, or checking her blood sugars.  (Id.)  However, she had no complaints and a normal physical exam.  (Id.)

In January 2010, Inteso had no complaints other than dysuria and had a negative comprehensive review of systems.  (Tr. 371)  Dr. Faiman recommended she tighten up her diet and exercise.  (Id.)  In February 2011, other than some GI issues, Inteso had no complaints and a negative comprehensive review of systems.  (Tr. 369)

In May 2011, Inteso required a coronary artery bypass grafting x3 ("CABG").  (Tr. 447-48, 488, 535, 859)  Shortly after surgery she continued to experience chest pain and discomfort.  (Tr. 719, 754)  In June 2011, Dr. Grinblatt stated that Inteso was "[i]mproving slowly."  (Tr. 756)  On July 15, 2011, Inteso reported chest pain following exertion and chest tenderness.  (Tr. 751, 753)  An EKG yielded normal results.  (Tr. 751, 753)  Dr. Grinblatt opined that Inteso's chest pain was nonanginal.   (Tr. 759)  Accordingly, he did not feel a stress test was necessary at that time.  (Id.) On August 1, 2011, Inteso reported feeling much better.  (Tr. 744)  Dr. Faiman recommended that she work on her diet and exercise.  (Id.)  Just over a week later, Inteso met with Dr. Grinblatt.  (Tr. 754)  Dr. Grinblatt stated that Inteso had recurrent chest pain relieved with nitroglycerin, but that she was "much improved" following CABG.  (Tr. 749-50)  She had a normal physical exam and no edema at that time.  (Tr. 750)

On November 1, 2011, Inteso reported that three weeks prior she had one episode of chest pain with dyspnea which two doses of nitroglycerin helped to alleviate.  (Tr. 782)  A physical exam revealed normal results and no edema.  (Tr. 783-84)  Dr. Grinblatt recommended she go to the emergency room if it reoccurred.  (Tr. 784)

In March 2012, Inteso reported uncontrolled blood sugar levels and problems with gout.  (Tr. 818)  Her doctor recommended she not eat late night carbs and that "any increase in activity

would be beneficial." (Tr. 818)  In April 2012, Inteso had a normal physical exam and Dr.

Faiman prescribed exercise, diet changes, and an increase in medication to treat her diabetes.

(Tr. 817)  In July 2012, Inteso reported occasional shortness of breath and fatigue.  (Tr. 1316)  In

December 2012, Inteso reported fatigue, but no chest pain or discomfort.  (Tr. 1319-20)  Dr.

Grinblatt noted that Inteso was "not faithful with simvastatin" and encouraged her to take her

medication for leg swelling, which he described as "intermitted and depend[ent] on gravity and

salt intake." (Tr. 1320)  Dr. Grinblatt stated that Inteso's reported arm and shoulder discomfort

was "not cardiac." (Tr. 1321)  Dr. Grinblatt also reported that Inteso last used nitroglycerin eight

months ago, which he stated was "a great success." (Tr. 1323)

### B.    Opinion Evidence

#### i.    State Agency Consultants

On September 19, 2011, a State agency medical consultant, Leigh Thomas, M.D.,

concluded Inteso retained the ability to lift up to 20 pounds occasionally and up to 10 pounds

frequently; stand/walk about six hours total during an eight-hour workday; sit for about six hours

total during an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel,

crouch, or crawl, but never climb ladders/ropes/scaffolds; and the need to avoid concentrated

exposure to cold, heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and

hazards (machinery, heights, etc.). (Tr. 54-56)  These findings were affirmed upon

reconsideration by another State agency medical consultant, Rachel Rosenfeld, M.D., on January

6, 2012, who noted there were no medical source opinions in the record.  (Tr. 66-68)  Michael

Colandrea, M.D. reviewed the case on January 25, 2012, and completed a form indicating he

agreed with the exertional, postural, manipulative, and environmental limitations previously

assessed. (Tr. 790).

### ii.        Dr. Grinblatt

In September 2011, Dr. Grinblatt completed a Cardiac Residual Functional Capacity Questionnaire ("CRFC") on behalf of Inteso.  He listed her symptoms as chest pain, anginal equivalent pain, shortness of breath, weakness, and fatigue/dizziness.  (Tr. 776)  Dr. Grinblatt indicated that emotional and physical stress could precipitate such symptoms.  (Id)  He stated that Inteso experienced constant cardiac symptoms.  (Tr. 777)

Dr. Grinblatt opined Inteso could stand/walk less than two hours total during an eight-hour workday and sit for about two hours total during an eight-hour workday.  (Id.)  Dr. Grinblatt felt she would need to take unscheduled breaks every 1-2 hours, and rest for 15-20 minutes before returning to work.  (Id.)  Dr. Grinblatt also stated she would need to keep her legs elevated 12 inches while sitting at least 25% of the time during an 8-hour workday.  (Id.)  He opined Inteso could occasionally lift 10 pounds, and frequently lift less than 10 pounds.  (Tr. 778)  Dr. Grinblatt noted that she would likely be absent about three times a month.  (Id.)  Dr. Grinblatt concluded that, due to Inteso's significant vascular disease, diabetes, and obesity, he could not "foresee her ability to work."  (Tr. 779)

In October 2015, Dr. Grinblatt provided an updated CRFC.  (Tr. 1373-76)  He added edema to her list of symptoms.   (Tr. 1373)  He opined that she was incapable of even "low stress" work because of limited coping mechanisms, obesity, angina, dyspnea, and that she gets easily frustrated.  (Id.)   He found that Inteso experienced frequent cardiac symptoms.  (Tr. 1374)  He opined that she could sit and stand/walk less than 2 hours in an 8-hour day; occasionally carry less than 10 pounds; and never carry any higher amount.  (Id.)  He opined that she had to take 30 minute unscheduled breaks 3-4 times a day and that she had to elevate her legs 30 degrees 30 percent of the time.  (Id.)  He also felt she would require the ability to shift positions

10

at will.  (Id.)  He determined that she could not stoop or crouch, and that she would be absent from work about twice a month.  (Tr. 1375)

### C.    Testimonial Evidence[4]

#### i.    Inteso Testimony

Inteso testified regarding the period between 2005 and 2012.  (Tr. 1537-49)  She testified that her heart condition began in 2005, but that she continued to work until the end of 2006.  (Tr. 1538)  At that time, Inteso had shortness of breath, exhaustion, sensitivity to cold, soreness, and leg swelling.  (Tr. 1538)  She testified that fatigue prevented her from working her past job.  (Tr. 1537-38)  She indicated that she experienced dizziness and chest tightness if she put her hands above her head, as well as shortness of breath and chest tightness following a 1 minute walk.  (Tr. 1539-40, 1547)  She stated that her ankles would swell, requiring her to elevate her feet above heart level.  (Tr. 1541)  Inteso stated that she had diabetes for an extended time, but could not remember when she was diagnosed.  (Id.)  She became insulin dependent a few years prior and was diagnosed with neuropathy.  (Tr. 1542-43)

She reported seeing her cardiologist, Dr. Grinblatt, every six months.  (Tr. 1544)  She stated that she could not stand very long in a day and had trouble with stairs.  (Tr. 1545)  She further stated that she could not sit for more than 30 minutes.  (Tr. 1545-46)  Inteso reported bad days during the relevant time period.  (Tr. 1547)  During a bad day, she would mostly lay on the couch with her legs up.  (Id.)  She would complete minimal chores and assist her mother as needed.  (Id.)

---

[4] In addition to Inteso and Dr. Pi, a vocational expert also testified at the hearing.  (Tr. 1572-82)  However, that testimony is not relevant to the current appeal.  As such, it will not be summarized herein.

ii.        **Testimony of Medical Expert Dr. Pi**

Medical Expert, Diana Jo-Chien Pi, M.D., also testified at Inteso's 2016 hearing.  (Tr.

1549-70; ECF Doc. No. 17, Page ID# 1667).  Dr. Pi testified that, between 2008 through 2012,

Inteso had the following severe impairments:  poorly controlled diabetes, atherosclerosis heart

disease, and peripheral neuropathy.  (Tr. 1549)  She opined that Inteso did not meet or equal a

listed impairment.  (Id.)  She then compared Dr. Grinblatt's 2011 RFC to his treatment notes.

(Tr. 1550)  Dr. Pi noted that in 2005, after finishing cardiac rehab, Inteso was "in a very good

place" and could walk without any symptoms. (Id; citing 12F/18)  Dr. Pi stated that there were

no 2009 notes from Dr. Grinblatt but that a note from her endocrinologist indicated that she had

no complaints and had a normal physical exam.  (Id.)  Dr. Pi also discussed a 2010 note from

Inteso's endocrinologist.  (Tr. 1551)  It indicated that Inteso was noncompliant with four

medications (due to a cost issue), yet had a normal physical exam other than some decreased

sensation in her feet and no complaints other than dysuria.  (Tr. 377, 1551)  Her doctor

recommended she exercise.  (Id.)  Dr. Pi pointed to a May 2011 treatment note when Inteso

experienced accelerated angina and underwent CABG.  (Tr. 1551)  Dr. Pi noted that prior to

CABG, Inteso had stopped taking Plavix "which [was] for her stents and Vytorin, which [was]

for her blood pressure plus cholesterol."  (Id.)

Dr. Pi explained that after CABG, Dr. Grinblatt saw Inteso more about every three

months or so.  (Id.)  He noted some chest pain after surgery but found it was not consistent and

not angina or cardiac related.  (Id.)  Dr. Pi explained that by July 2012, Dr. Grinblatt's treatment

notes indicated Inteso had no chest pain, no discomfort, no lightheadedness, no dyspnea on

exertion, normal lungs and heart, no edema and was not waking up at night short of breath.  (Tr.

1551-52)  Dr. Grinblatt indicated Inteso was a great success.  (Tr. 1552)  Nonetheless, Dr. Pi

noted the symmetry between Dr. Grinblatt's 2015 and 2011 CRFCs.  (Id.)  Dr. Pi opined that Dr. Grinblatt's biggest concern was Inteso's ability to handle the mental demands of stress.  (Tr. 1552)  She explained that based on objective testing, Inteso showed no signs of heart failure. (Id.)  Dr. Pi opined that Inteso's uncontrolled blood sugar and lack of exercise likely caused her fatigue.  (Tr. 1552-53)  She noted numerous treatment notes recommended physical exercise. (Tr. 1553)  Dr. Pi further noted that a 2014 stress test demonstrated well preserved heart function.  (Id.)

The ALJ then asked Dr. Pi to give an RFC for the period from April 1, 2008, to March 31, 2012.  (Tr. 1553)  Dr. Pi advised that although her angina improved after the CABG, she would provide a RFC encompassing the entire period (i.e., taking into account Inteso's pre and post-CABG condition).  (Id.)  She opined that Inteso could frequently lift up to 10 pounds; occasionally lift up to 20 pounds; sit 6 hours in an 8-hour day; frequently use feet; occasionally climb stairs, stoop, kneel, crouch or crawl; never climb ladders or scaffolds; avoid unprotected height and not operate dangerous machinery.  (Tr. 1554)

On cross examination by Inteso's attorney, Dr. Pi testified that Inteso had intermittent mild edema.  (Tr. 1558)  She noted that the majority of treatment notes showed no edema.  (Id.) She also opined the edema came from a combination of factors including weight, dietary discretion, and failure to take her blood pressure medication.  (Tr. 1558-59)  Dr. Pi opined that the degree of edema Inteso had would not limit her walking and that she had to occasionally elevate her legs but that she could do so at night while sleeping.  (Tr. 1560)   She also noted that exercise would help in alleviating her edema.  (Id.)   Dr. Pi explained that a Venus Doppler study showed no structural problems in her legs.  (Id.)

Dr. Pi testified that Inteso's biggest problem during the 2008 through 2012 time frame was accelerated angina. (Tr. 1564) Dr. Pi stated that it was hard to tell when Inteso stopped taking Plavix and Vytorin ("which was essential to keep her stent open"), but that by April 2011 she was "definitely in trouble." (Tr. 1565) Dr. Pi reiterated that in 2009 and 2010, Inteso had no complaints (other than burning urination), despite not taking her medication or checking her sugar. (Tr. 1566) Inteso's counsel questioned Dr. Pi regarding some treatment notes referencing chest pain or heaviness. (Tr. 1568-69) Dr. Pi stated that although Dr. Grinblatt noted recurrent chest pain, it was not consistent with angina. (Id.) Dr. Pi also explained that Inteso's chest pain improved shortly after the CABG. (Tr. 1570)

## VI.     Law & Analysis

### A.      Standard of Review

This court's review is limited to determining whether substantial evidence in the record supports the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law is harmless.

*See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## B.    Overview of Inteso's arguments

Inteso presents two issues for review:  (1)  whether the ALJ's decision violated the law-of-the case doctrine when addressing the validity of treating cardiologist Michael Grinblatt's opinions concerning Inteso's capabilities between 2008 and 2011; and (2) whether the ALJ's credibility analysis of Inteso's statements complied with SSR 16-3p.  ECF Doc. No. 17, Page ID# 1668.

### 1.      Law-of-the-case doctrine

Inteso argues that the ALJ violated the law-of-the-case doctrine in his evaluation of Dr. Grinblatt's opinion.  The law-of-the case doctrine dictates that "findings made at one point in the litigation become the law of the case for subsequent stages of that litigation." *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir.2002).  In *Mefford v. Gardner,* 383 F.2d 748, 758 (6th Cir.1967), the Sixth Circuit addressed the duty of the Commissioner when a case is remanded by a federal district court.  *Mefford* .  Generally, "on the remand of a case after appeal, it is the duty of the lower court, or the agency from which appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions."  *Id.*  "[I]f the cause is remanded with specific directions, further proceedings in the trial court or agency from which the appeal is taken must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any proceedings inconsistent therewith is error." *Id.*  "Deviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson,* 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989) (citing *Mefford,* 383 F.2d at 758–759. These principles and authorities are not an absolute bar to an ALJ going beyond a district court's order but, they do prohibit any action that is inconsistent with an express or implied order.  *Hollins v. Massanari,* 49 Fed. Appx. 533, 536 (6th Cir.2002).

### a.      Law-of-the-case does not apply to Appeals Council Order

Here, the parties stipulated to a remand.  In the remand order, Magistrate Judge Kathleen B. Burke stated in pertinent part: "The ALJ will further evaluate the opinion of the treating cardiologist, Dr. Grinblatt."  ECF Doc. No. 18, Page ID# 944.  Inteso does not argue that the ALJ failed to follow Magistrate Judge Burke's order (i.e., to "further evaluate" Dr. Grinblatt's

opinion). See ECF Doc. No. 17, Page ID# 1670 ("…no 'findings' were made by the district court because the remand in this case originated in a joint stipulation of the parties…"). Instead, Inteso's argues that the ALJ violated the law-of-the-case doctrine by not addressing the Appeals Council remand order requiring the ALJ to address Dr. Grinblatt's opinion as it relates to the time period between 2008 and 2011. ECF Doc. No. 17, Page ID# 1670-71.

Inteso provides no support for her assertion that the law-of-the-case doctrine applies to the Appeals Council decision and this court finds none. *See Maralason v. Comm'r of Soc. Sec.*, No. 15-CV-11666, 2016 WL 5405302, at \*4 (E.D. Mich. Sept. 28, 2016) (finding that the law-of-the-case doctrine applies to district court decisions, "not internal, agency-level remands.") *See Hollins v. Massanari*, 49 F. App'x 533, 535 (6th Cir. 2002) (applying "law of the case doctrine" to determine whether ALJ's decision conflicted with remand order from district court); *Brachtel v. Apfel*, 132 F.3d 417, 419-20 (8th Cir. 1997) (same); *Poppa v. Astrue*, 569 F.3d 1167, 1170 (10th Cir. 2009) (same); See Also 2 Soc. Sec. Disab. Claims Prac. & Proc. § 19:78 (2nd ed.) ("The doctrine of 'the law of the case' holds that the Commissioner is bound on remand from a Federal Court by the scope of the court's mandate."). As the U.S. Supreme Court stated in *Sullivan*, "[d]eviation from *the court's* remand order in *subsequent administrative proceedings* is itself legal error, subject to reversal on further judicial review." *Sullivan,* 490 U.S. at 886 (citing *Mefford,* 383 F.2d at 758–759) (emphasis added). *Sullivan* does not state that deviation from the *administrative order* after remand is legal error. Thus, I conclude that the law of the case doctrine regulates only the follow up to the district court's order and not to subsequent orders of the administrative agency, and I recommend that the court find Inteso's argument to the contrary not well taken.[5]

---

[5] In addition to *Medford* and *Sullivan*, Inteso also cited this court's decision in *Parsons v. Comm'r of Soc. Sec.*, No. 1:11-CV-01063, 2012 WL 3852927, at \*2 (N.D. Ohio Sept. 5, 2012) in support of her argument.

### b.    Compliance with Appeals Council order not reviewable

To the extent Inteso argues more generally that the ALJ's noncompliance with an

Appeals Council order requires remand, that argument also fails because the Appeals Council

order is not separately judicially reviewable.

Although the Sixth Circuit has not addressed whether an ALJ's compliance with an

Appeals Council order is judicially reviewable, the district court's analysis in *Shope v. Comm'r*

*of Soc. Sec.* is compelling:

> "[T]here is no consensus among federal courts regarding whether an ALJ's failure to
> follow Appeals Council directives in a remand order may serve as independent grounds
> for reversal absent other error." *Godbey v. Colvin*, 2014 WL 4437647, at *5 (W.D. Ky.
> Sept. 9, 2014). "Differing opinions exist not only between circuits, but also among courts
> within the Sixth Circuit, which has not considered this particular issue." *Brown v.
> Comm'r of Soc. Sec.*, 2009 WL 465708 (W.D. Mich. Feb. 24, 2009); *Salvati v. Astrue*,
> 2010 WL 546490 (E.D. Tenn. Feb. 10, 2010). Some courts consider an administrative
> law judge's failure to comply with directives of the Appeals Council to be a procedural
> error that can be so great as to deny the claimant fair process, *Godbey*, 2014 WL 4437647
> at *6–7; *Salvati*, 2010 WL 546490 at *4–8; others assume, without deciding, that such an
> error may serve as an independent ground for reversal. *Keating v. Comm'r of Soc. Sec.*,
> 2014 WL 1238611, at *15 (N.D. Ohio Mar. 25, 2014); *Kearney v. Colvin*, 14 F.Supp.3d
> 943, 950 (S.D. Ohio 2014); [*see also, Gholston v. Comm'r of Soc. Sec.*, 2009 WL 440956,
> at *12 (E.D. Mich. Feb. 23, 2009); *Fluker v. Comm'r of Soc. Sec.*, 2013 WL 1122876, at
> *15 (E.D. Mich. Feb. 11, 2013) ]. The overwhelming majority of courts in this circuit,
> however, have determined that federal courts lack jurisdiction to consider whether an
> administrative law judge complied with the Appeals Council's instructions on remand.
> *See O'day v. Comm'r of Soc. Sec.*, 2015 WL 225467, at *6 (W.D. Mich. Jan. 16, 2015);
> *Verschueren v. Comm'r of Soc. Sec.*, 2014 WL 4925866, at *10 (W.D. Mich. Sept. 30,
> 2014); *Caldwell v. Colvin*, 2014 WL 3747548, at *3 (E.D. Ky. July 29, 2014); *Cooper v.
> Colvin*, 2014 WL 2167651, at *2 (W.D. Ky. May 23, 2014) ("Plaintiff's contention that
> the ALJ's decision does not comply with the Remand Order is not cognizable in this
> judicial review."); *Prichard v. Astrue*, 2011 WL 794997, at *15 (M.D. Tenn. Feb. 28,
> 2011) ("Plainly stated, this Court's scope of review 'is limited to an analysis of the ALJ's
> decision and not a review of the ALJ's compliance with the Appeals Council's Order of
> Remand.' "), report and recommendation adopted, 2011 WL 1113755 (M.D. Tenn. Mar.
> 25, 2011); *Peterson v. Comm'r of Soc. Sec.*, 2010 WL 420000, at *7 (E.D. Mich. Jan. 29,

---

However, in *Parsons*, Judge Gwin reversed and remanded the ALJ's decision because he found that the
ALJ deviated from the *district court* remand order -- not because the ALJ deviated from the Appeals
Council order.  *Parsons*, 2012 WL 3852927 at *2 ("ALJ Round deviated from this Court's remand order
when he reviewed the Plaintiff's RFC *de novo* and determined that she suffered no manipulative
limitations.")

2010) ("[S]ince 'the district court does not review internal agency-level proceedings, it will not address whether the ALJ complied with the specific provisions of the Appeals Council's order of remand.' "); *Dishman v. Astrue*, 2009 WL 2823653, at *11 (E.D. Tenn. Aug. 27, 2009); *Riddle v. Astrue*, 2009 WL 804056, at *19 (M.D. Tenn. Mar. 25, 2009); *Brown*, 2009 WL 465708 at *5 ("Plaintiff's appeal is inappropriate, because it seeks to have this court review an internal agency matter.... Nevertheless, the court concludes that it lacks jurisdiction to address plaintiff's claims."). This Court agrees that federal courts lack jurisdiction to consider whether an administrative law judge has complied with the Appeals Council's instructions on remand.

*Shope v. Comm'r of Soc. Sec.*, 2015 WL 3823165, at *8 (S.D. Ohio June 19, 2015), report and recommendation adopted, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015); *See also Tyler v. Astrue*, 305 F. App'x 331, 332 (9th Cir. 2008) ("The district court properly declined to evaluate whether the ALJ's second decision satisfied the demands of the Appeals Council's remand. The law of the case doctrine does not apply because the Appeals Council remanded to the ALJ to make further findings; it did not decide any issues of fact or law itself. Additionally, federal courts only have jurisdiction to review the final decisions of administrative agencies. *See* 42 U.S.C. § 405(g).")

The undersigned agrees with the majority of courts in this circuit, that federal courts lack jurisdiction to consider whether an ALJ has complied with an Appeals Council instruction on remand and declines to do so.

### c.    The ALJ met the directives of the Appeals Council order

Notwithstanding all of the above, in the alternative, the undersigned also finds that the ALJ met the directives of the Appeals Council remand order as it pertained to Dr. Grinblatt's opinion.  In pertinent part, the Appeals Council stated the following:

[Dr. Grinblatt's] opinion was rejected because the evidence did not support [his] conclusions (Administrative Law Judge Hearing Decision, August 20, 2012, pg. 5 of 6). The decision specified that Dr. Grinblatt reported the claimant's status as "much improved," that the claimant's gait was normal, and that the claimant engaged in daily activities of laundry, shopping, and caring for her mother (Id.).  With respect to Dr. Grinblatt's comments, the claimant was reported to be much improved in August 2011,

three months post cardiac revascularization (Ex. 14F/6). However, the claimant alleges onset of disability since April 2008. Moreover, Dr. Grinblatt has treated the claimant since the alleged onset date and the opinion itself considered the period from April 1, 2008 through the present (Ex. 16F/3). One month earlier, Dr. Grinblatt reported the claimant having lots of chest discomfort with tenderness over sternum and bilateral axilla (Ex. 14F/9). While the claimant may have been improved in August 2011, this rationale does not address the validity of Dr. Grinblatt's opinion during the initial three years of the alleged period of disability…

(Tr. 873-74; ECF Doc. No. 17, Page ID# 1670-71)(emphasis added by Inteso).  Inteso contends that the "The ALJ committed the same error in his June 24, 2016 decision denying benefits by considering only Exhibit 37F, which documents Dr. Grinblatt's July 10, 2012 to September 22, 2015 treatment notes.  (Tr. 860)  Contrary to the Appeals Council's Order, the ALJ never addressed the validity of Dr. Grinblatt's opinion during the initial three years of the alleged period of disability."[6]  (Tr. 873-74)  The Commissioner contends in opposition that the ALJ appropriately addressed the Appeal's Council's concerns regarding Dr. Grinblatt's opinion.  ECF Doc. No. 18, Page ID# 1699-1700-01.

Contrary to Inteso's assertion, the ALJ's decision referred to several treatment notes and opinions from the 2008-2011 period.  [Tr. 859-60, Exs. 3F (2008), 4F (2005-2009), 8F (2007-2011), 9F (2008-2011), 12F (2005-2011), 16F]  Moreover, the ALJ gave great weight to medical expert Dr. Pi who testified based on her analysis of Dr. Grinblatt's treatment notes beginning in 2008.  (Tr. 1549-72)  In fact, the ALJ specifically asked Dr. Pi to compare Dr. Grinblatt's 2011 RFC to the treatment notes.  (Tr. 1550)  Dr. Pi did so, discussing treatment notes from Dr. Grinblatt and other medical providers from the 2008-2012 period.  (See e.g., Tr. 1550-52, 1564-70)

---

[6] Notably, Inteso has not identified any of Dr. Grinblatt's treatment records from this period that contradict the ALJ's findings and does not make a substantial evidence or treating source rule argument.

The ALJ also asked Dr. Pi to identify Inteso's severe impairments from 2008 to 2012 and provide an RFC for the period from April 1, 2008, to March 31, 2012.  (Tr. 1549, 1553)  Dr. Pi testified that, during that period, Inteso had "very poorly controlled diabetes, atherosclerosis heart disease, and peripheral neuropathy as a result of the diabetes."  (Tr. 1549)  Dr. Pi noted that Inteso's capability was different a few months before her 2011 surgery and improved after, however, she noted that she would provide a RFC for the entire period.  (Id.)  Accordingly, Dr. Pi opined that Inteso had the RFC to frequently lift 10 pounds and occasionally lift 20 pounds; sit 6 hours; stand/walk six hours; frequently use both feet; occasionally climb stairs; avoid all ladders, scaffolds, and unprotected heights; and occasionally stoop, crouch, kneel, or crawl.  (Tr. 1553-54)  Consistent with the treatment notes, Dr. Pi also found Inteso's edema to be mild and sporadic.  (Tr. 861, 1558-64)  Both Dr. Pi and the ALJ point out that objective testing has yielded normal results. (Tr. 860, 1553, 1561)  Inteso does not argue that Dr. Pi left out or misrepresented any important evidence during her review of the relevant period.

The record simply does not support Inteso's argument that the ALJ committed the "same error" by considering only evidence from 2012 through 2015.  The ALJ referred to treatment notes from the 2008-2012 period and he repeatedly requested Dr. Pi's testify about the relevant time.  Inteso's argument concerning the ALJ's handling of the issues on remand lacks merit and is, in part, beyond the jurisdiction of this review.  I recommend that the first argument be rejected on this ground.

### 2.    Credibility

Inteso argues that the ALJ's credibility analysis failed to comply with SSR 16-3p.[7]  Inteso admits that the ALJ identified the correct two-step process for evaluating her subjective

---

[7] SSR 16-3p provides that "[a]n individual's statements as to her pain and other symptoms cannot alone establish that she is disabled. 20 C.F.R. §404.1529(a). Instead, the agency rulings and regulations describe

complaints, but argues that the ALJ's credibility determination was flawed for (1) rejecting her symptoms based on medical evidence alone;[8] and (2) not providing sufficient specificity to the weight given to her statements.[9]  The Commissioner responds that the ALJ adequately assessed Inteso's symptoms, relying on medical and other evidence.  ECF Doc. No. 18, Page ID# 1701-04.

A reviewing court shall give great weight and deference to the ALJ's credibility determinations, particularly since the ALJ is charged with observing a witness's demeanor. *Jones v. Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying."). The ALJ is not required to accept Plaintiff's allegations or subjective disability complaints. *See Id.* at 476 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.").

Inteso testified that she experienced chest pressure, shortness of breath when walking, and leg pain due to edema.  (Tr. 859)  She testified that she had to elevate her legs due to the edema and that her blood sugars were uncontrolled.  (Id.)  The ALJ determined that her medical impairments could reasonably cause the alleged symptoms, but that the limiting effects of those

---

a two-step process for evaluating an individual's symptoms:  First, [the ALJ] must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluates the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult or to function independently …"  SSR 16-3p: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *2-5 (S.S.A. Mar. 16, 2016) (Exhibit 1);  20 C.F.R. §404.1529(a); see also Duncan v. Sec'y of H.H.S., 801 F.2d 847, 853-854 (6th Cir. 1987) (applying this evaluation).
[8] *Citing Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994).
[9] *Citing Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007).

symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." (Tr. 859)  The ALJ noted several inconsistencies in the evidence.  For example, the ALJ found that Dr. Pi's opinion conflicted with that of Dr. Grinblatt and Dr. Grinblatt's opinion was not supported by his own treatment notes.  (Tr. 860-61)  An ALJ may discount a claimant's credibility when the medical records evidence is not consistent with the claimant's testimony and other evidence.  *Walters. v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997)  The ALJ also found the claim that Inteso had to constantly elevate her legs during working hours to be less than credible.  The ALJ determined, consistent with Dr. Pi's opinions and other treatment notes, this condition remained "mild and sporadic" following CABG surgery.  (Tr. 861; Citing to Exs. 36F and 37F)  The ALJ also noted that, despite Inteso's claims of disability, her objective testing was consistently within normal limits.  (Tr. 860)

The ALJ further found that Inteso "remained capable of functioning independently outside her home and seeking treatment when needed." (Tr. 860)  Although the ALJ described Inteso as "sensitive to stress," he noted that she was able to participate in physician appointments; perform household chores, self-care and drive; as well as concentrate and respond appropriately to questions during the course of the hearing.  (Tr. 857); See SSR 16-3p at *4-5, 7 (in assessing a claimant's symptoms, consideration is given to a claimant's own statements and daily activities); 20 C.F.R. § 404.1529(c)(3) (the ALJ must consider other evidence, including daily activities, when assessing claimant's subjective complaints).

The ALJ acknowledged Inteso's uncontrolled diabetes throughout the alleged disability period.  However, despite uncontrolled diabetes since 2009, the ALJ noted Dr. Faiman's 2011 recommendation that Inteso stay off of insulin and work on her diet and exercise.  (Tr. 750, 860)

In fact, Dr. Faiman's frequent recommendations that Inteso engage in an exercise routine without any noted limitations calls into question her claims that she can rarely walk, stand, or sit.  (See e.g., 371, 744)

Based on all of the above, the ALJ's assessment of Plaintiff's allegations complied with SSR 16-3p.  And his credibility findings justified the further finding that plaintiff's allegations of severe restriction in functional capacity were not consistent with the medical and other evidence in the record (Tr. 859).  Moreover, Inteso has not shown that the ALJ's credibility conclusion was outside the "zone of choice" within which an ALJ may make findings without "interference by the courts." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009). Thus, the Court should affirm the decision.

## VII.    Recommendation

Inteso has not identified any error of law or lack of substantial evidence supporting the ALJ's decision in this action.  Accordingly, I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).


Dated: October 4, 2017

Thomas M. Parker
United States Magistrate Judge

----

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).